IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| JIMMY R. NICKS and<br>WILLIAM MCNEAL,<br>individually and on behalf of all<br>persons similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>PECO FOODS, INC., *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 7:16-CV-01057-LSC |

**MEMORANDUM OF OPINION**

Plaintiffs Jimmy R. Nicks ("Nicks") and William McNeal ("McNeal") (collectively, "Plaintiffs") filed this action against Defendants Peco Foods, Inc. ("Peco") and ARMCO Services, Inc. ("ARMCO")[1] under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the "FLSA") on June 29, 2016. Before the Court is Plaintiffs' Amended Motion for Conditional Certification and to Facilitate Notice Pursuant to 29 U.S.C § 216(b). (Doc. 69.) The motion has been fully briefed and is now ripe for decision. For the reasons stated below, the motion (doc. 69) is due to be GRANTED.

---

[1] Armco Services, Inc. was originally named in this action. The court approved a settlement between Armco and Plaintiffs on August 10, 2017. (Doc. 88, Order Approving Settlement.) Consequently, this Opinion will address certification against Peco Foods only.

## I. BACKGROUND

Peco is a vertically integrated chicken processing and packing company with facilities in various locations across Mississippi, Alabama, Arkansas and Missouri, and is headquartered in Tuscaloosa, Alabama. (Doc. 63 at 12-13.) Since approximately 2011, Peco has used independent contractors[2] for catching chickens for five out of its six complexes.[3] Peco negotiates individual contracts with its independent contractors who then invoice Peco for the work completed.[4] While Peco does not maintain information on the pay rates that the independent contractors use, the form Independent Contractor Agreements between Peco and each of the independent contractors require that contractors comply with federal

---

[2] Peco has agreements with the following catching contractors: Armco Services, Inc.; Akin Poultry, LLC; Attoyac Services, Inc.; Unicon; and Gill Enterprises. (*See* Doc. 74-4.)

[3] The Bay Springs, Mississippi complex continues to employ chicken catchers directly. (Doc. 63 at 10-11.) Until 2011, Peco directly employed chicken catchers at all its locations. (Doc. 63 at 15.) Plaintiffs allege that Peco moved to contractors following a 2011 lawsuit against it for failure to pay workers for overtime and wait time. (Doc. 63 at 15-16.) Peco argues that that the change to independent contractors was due to difficulties in staffing the complexes directly. (Doc. 75 at 10 n. 5.) Roddy Sanders, Peco's Director of Live Operations and 30(b)(6) representative did not deny that the suit was at least "a factor" in Pecos' decision. *See* Sanders Dep. 143:4-19 ("I'm not going to say it wasn't a factor in consideration because it's something we had been studying for some time . . . it was a small factor").

[4] "Peco provides a lump sum directly to the catching contractor as invoiced pursuant to the terms/rates agreed to in the contract." (Doc. 74-4 at 4-5.)

and state regulations.[5] Peco pays the companies per one thousand chickens caught, and allegedly does not pay any extra compensation for downtime work or overtime work performed. The two named Plaintiffs were employed via independent contractor Armco at Peco's Gordo Complex and/or Sebastopol Complex. Of the forty-four opt-in forms provided as of the date of Plaintiffs' motion for certification,[6] including those of Nicks and McNeal, nearly all have been from workers employed by Armco at either the Gordo or Sebastopol Complex.

Peco operates six Live Operations complexes located in Alabama, Mississippi, and Arkansas, all of which oversee the supply of broiler chickens to Peco's processing facilities. (Doc. 75 at 7-8.) Putative class members'[7] work

---

[5] Plaintiffs aver that "[w]hile the Independent Contractor Service Agreements all have a provision that requires the contractor to 'comply with all federal and state employment payroll tax and overtime/minimum pay regulations', Peco does not take any steps to ensure that the contractor complies with this provision of the contract, or other provisions relating to compliance with pay laws." Roddy Sanders, Peco Director of Live Operations, Dep. 177:12-177:13 (Q: And what does Peco do to ensure that the contractor does, in fact, comply with these regulations? A: I – that's the contractor's responsibility); Ex. M, Independent Contractor Service Agreements." (Doc. 63 at 17-18.)

[6] Since the filing of the Motion to certify, Plaintiffs have filed seven additional notices of consent to become party plaintiffs with accompanying signed opt-in consent forms for ten individuals. (Docs. 89, 91, 92, 93, 94, 95 & 96.)

[7] "The FLSA Collective does not include any live-haul chicken-catching crew members who were directly employed by Peco (and not via a third-party contractor), all of whom worked out of Peco's Bay Springs Complex. The FLSA Collective also does not include any live-haul chicken-catching crew members who were paid solely via the third-party contractor, Unicon, Inc., as the Independent Contractor Service Agreement between Unicon and Peco provided for the payment of wait time and overtime compensation." (Doc. 63 at 9 n. 2.)

involves the capture of chickens to supply to the Peco facilities. Plaintiffs are hired by independent contractors and placed on live-haul crews of "approximately ten to twelve workers, generally including eight to nine catchers, one or two forklift operators, and crew leader." (Doc. 1 at 6.) Plaintiffs and the putative class members travel to the farms to capture chickens and place them in cages for transport to Peco's poultry processing plants at each of the Peco Complexes. (Sanders Dep. at 36.) On a typical shift, Plaintiffs estimate "between 36,000 and 42,000 chickens are caught by one live-haul crew." (Doc. 1 at 10.) Crews are "transport[ed] from their homes to motels or trailer parks, where they stay the nights during the workweek" and also are transported "between motels and trailer parks and the farms where they perform Peco's chicken catching, at times travelling an hour or more." (*Id.* at 7.)

Plaintiffs aver that Peco oversees[8] the live-haul crews' work in addition to "dictat[ing] their schedules" as well as their "daily activities and working conditions." (Doc. 1 at 7; Doc. 63 at 21.) For example, "a Peco office employee

---

[8] According to Roddy Sanders, the Director of Live Operations Department at Peco, "[t]he management team at each complex is led by a Live Operations Manager, who [he] supervise[s]. Underneath the Live-Operations Manager, is a Live-Haul Manager. The Live-Haul Manager supervises multiple Live-Haul Supervisors. The Live Operations Manager and his/her management team independently manage and make decisions related to Live Operations at their complex. This includes the management of the relationship between Peco and the catching contractor(s) who service their complex." (Doc. 74-4 at 2.)

called a live production supervisor determines the schedule, assignments and order of work of the crews, in conjunction with a Peco 'service man,' who visits the work sites and the crews one to two times a week and reports his findings and observations to his superiors at Peco." (Doc. 1 at 7.) The Peco live production supervisor also "issues daily instructions" which determine the "chicken houses the live-haul crews shall work [in] and how many and which chickens they will catch and cage for Peco." *Id.*

The individuals in the live-haul crews perform substantially the same work tasks at each Peco facility. While the number of hours worked or chickens harvested may vary slightly from day to day, the duties performed by each live-haul crew are alleged to be almost indistinguishable no matter their third-party contractor or farm location.[9] As such, Plaintiffs aver that all crew members were subject to the same work environment, reporting structure, and Peco policies and practices.

---

[9] Plaintiffs also aver that "All crew members were subject to the same work environment and Peco policies, and Peco paid each of the contractors on a piece rate basis and took no steps to ensure that the chicken catchers were paid properly." (Doc. 63 at 30.)

Plaintiffs allege Peco paid each contractor on a piece rate basis, and the independent contractors in turn failed to pay for overtime hours or time spent waiting for work to become available when calculating remittance they were due.[10]

## II. STANDARD OF REVIEW

Section 216 (b) of the FLSA allows a cause of action for plaintiffs "for and in behalf of . . . themselves and other employees similarly situated." 29 U.S.C. § 216(b). The court has the "discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential class members." *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169, (1989); *see Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) ("The decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court."); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008). Plaintiffs who bring a class action suit under § 216(b) may only include members of the class who opt into the suit. *Hipp*, 252 F.3d at 1216. The Eleventh Circuit has endorsed a two-tiered system for the certification of classes in suits under § 216(b) of the FLSA. *See Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562 (11th Cir. 1991).

---

[10] Multiple declarations submitted by Plaintiffs allege that Peco contractors did not pay overtime for work performed in excess of forty hours in a week and that those affiants routinely work more than ten to twelve hours per day, five to six days a week. (Doc. 63 at 23 citing Docs. 63-4, 63-5, 63-6, 63-7, and 63-8.)

The first step in the process, often denoted as the "notice stage," is a conditional certification of the class. Conditional certification should be granted when "a plaintiff [meets] the burden of showing a 'reasonable basis' for his claim that there are other similarly situated employees." *Morgan*, 551 F.3d at 1260 (citations omitted); *Dybach,* 942 F.2d at 1568 ("the district court should satisfy itself that there are other employees of the department-employer who desire to opt-in and who are similarly situated with respect to their job requirements and with regard to their pay provisions.") (internal quotations and citations omitted). The standard for granting conditional certification is "fairly lenient", typically resulting in the conditional certification. *Hipp,* 252 F.3d at 1218; *see also Grayson v. Kmart Corp.*, 79 F. 3d 1086, 1096 (11th Cir. 1996) ( holding Plaintiffs need not establish "a unified policy, plan, or scheme of [unlawful activity] to satisfy the liberal similarly situated requirement of § 216(b)") (internal quotations omitted).

After discovery "is largely complete and the matter is ready for trial," the court may undertake the second step—final certification—generally in response to a motion for "decertification" by the defendant. *Hipp*, 252 F.3d at 1218. At this second stage, the court, which "has much more information on which to base its decision[,] makes a factual determination on the similarly situated question." *Id.* However, even at the second stage, the decision to certify a collective action is

within the district court's discretion. *Anderson v. Cagles, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007).

III. DISCUSSION

A. Motion for Conditional Class Certification

*i. Desire of Other Employees to Opt-In*

For a class to receive conditional certification, Plaintiff must show that there is a desire among other employees to opt-in to the suit. This showing is analyzed under a lenient standard and is not required to be extensive. Plaintiffs include fifty opt-in forms besides their own. (Doc. 63 & n. 2 *supra*.) While the additional opt-ins were employed at the same facility as Plaintiffs, by the same contractor, for purposes of determining opt-in interest, these forms provide enough evidence.

The number of persons who have indicated an interest in the class action suit is only a single facet when determining the inclination of others to opt-in. *Dybach*, 942 F.2d at 1567. There is no specified numerocity requirement for conditional certification. Conditional certification has been granted when employees are paid in the same way as Plaintiffs.[11] Because Peco's relationship with each contractor involves a substantially similar pay scheme, and Plaintiffs allege that other locations

---

[11] *See Nicks v. Koch Meat Co., Inc.*, 265 F.Supp.3d 841 (N.D. Ill. Sept. 18, 2017). *See also Tucker v. Labor Leasing, Inc.*, 872 F.Supp. 941, 948 (M.D. Fla. 1994) (similar, not same pay structure); see also *Santiago v. Mid-South Painting, Inc.*, 2011 WL 3418252, at *4 (S.D. Fla. Aug. 3, 2011).

also have similar wait time and travel time pay structures, they are similar enough to warrant conditional certification.[12]

Evidence of a common policy or scheme is another way to show employees opt-in interest of other employees. *See Anderson v. Cagle's Inc.*, 488 F.3d 945, 952 (11th Cir. 2007) (finding the district court had properly conditionally certified a collective action where plaintiffs provided "'detailed allegations,' which established essentially 'the same job requirements and almost identical treatment' among the group of employees defined in the collective-action notice the district court ultimately approved. Allegations were supported to some extent by the employers' 'admissions, and other documentary evidence.'"). Here, Plaintiffs argue that Peco has systematically avoided paying overtime and wait time by choosing to use third-party contractors at all locations, which is indicative of a common policy or scheme. They have also provided sufficient evidence[13] to meet the lenient burden showing the existence of significant interest among Peco employees of joining in the suit.

---

[12] *See Lima v. Int'l Catastrophe Solutions, Inc.*, 493 F.Supp.2d 793, 800 (E.D. La. 2007) (granting class certification covering multiple contractors even though affiants had only been employed by a single contractor.)

[13] Plaintiffs have provided specific testimony in the form of five declarations of Opt-In Plaintiffs, deposition excerpts of Peco's corporate designee Roddy Sanders, Peco Organizational Charts, kill sheets, catch reports, Animal Welfare Guidelines, Contractor Agreements, and invoices.

### ii. *"Similarly situated" Requirement*

Another factor in establishing the appropriateness of conditional certification is showing that the other members of the potential class are similarly situated. While the positions occupied are not required to be identical, they must be similar. *Grayson v. K Mart Corp.*, 79 F.3d 1086 at 1096 (11th Cir. 1996). Employees who share the same job requirements and pay provisions are similarly situated. *Dybach,* 942 F.2d at 1567-68. Plaintiffs, along with the class they have identified, fulfill both requirements.

The job requirements are the same among the members of the putative class. Live-haul chicken catchers all are involved in "manually catching chickens inside the chicken houses" and "placing them in cages for transport." (Doc. 63-5 at 3, Doc. 63-6 at 3, Doc 63-8 at 3, Doc. 63-9 at 3.) The job duties of each live-haul chicken catching crew are the same no matter the complex or contractor. (Sanders Dep. 78-79.) The potential class members are thus similarly situated as to their job duties.

The pay scheme used by Peco is also substantially similar for all members of the putative class. While potential class members are employed by different contractors at different locations, Peco negotiates the same type of form contract with each of its contractors. Though the contracts vary slightly, the manner in

which Peco deals with each of the contractors, and how the contractors in turn deal with the chicken catchers is sufficiently similar. The different chicken catchers are not required to have been paid the exact same wage, or rate; rather the overarching scheme leading to the purported abuse must be comparable. Plaintiffs' allegations that Peco used contractors in order to avoid paying overtime are sufficient to warrant certification.[14]

In opposition, Peco argues that the "Court should deny Plaintiffs' motion for conditional certification in whole or in part for the following reasons: (1) the issues in this case are not appropriate for collective treatment because they will require a very fact-intensive and individualized analysis by the Court; (2) Plaintiffs' have not met their burden of producing 'substantial allegations' that they are "similarly situated" with then non-Armco catchers; and (3) Plaintiffs have produced no evidence that any non-Armco catchers wish to opt-in to this case." (Doc. 75 at 15-16.)

---

[14] At this stage in the certification process, a ruling on the veracity of allegations is inappropriate. Plaintiffs' claims combined with the evidence contained in the affidavits are sufficient to raise allegations above the level of mere accusation. Additionally, Peco's admission that in transitioning from direct hiring to contractor hiring, it considered that this new pay scheme would reduce costs associated with payment of overtime and wait time to chicken catchers is of particular import. (Sanders Dep. 143:4-19.)

None of the above arguments is availing. First, the Court need not embark upon a "fact-intensive or individualized analysis" at this stage in the proceedings.[15] *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) (plaintiffs allowed to prove nonpayment at trial, and class was conditionally certified even though protective gear worn by plaintiffs varied day to day and location to location). Though there is some variation among the putative class members, as stated above, conditional certification does not require identicalness.

Secondly, Defendants cite, *Saxton v. Title Max of Alabama, Inc.*, 431 F.Supp.2d 11885 (N.D. Ala. 2006) in support of their argument that Plaintiffs have failed to produce "substantial allegations" they are similarly situated. The case is distinguishable because in *Saxton* the plaintiff submitted only a few affidavits which did not meet the requisite showing of similarity, or interest of opting into the lawsuit. The affidavits presented by plaintiff in *Saxton* as evidence did not even aver that they had worked in excess of 40 hours per week. In opposition, the defendant employer submitted 158 affidavits that potential-class members likely had no interest in opting into the suit and that tended to show compliance with

---

[15] Peco asserts a number of other arguments such as the Portal to Portal Act, 29 U.S.C. § 254(a), independent contractor defense, and also Peco is not joint employer with its contractors. All would require an analysis of the merits, and the Court is not required to adjudicate the case before resolving the issue of conditional certification and notification. Indeed the purpose of conditional certification and notification is to allow potential plaintiffs to opt-in *before* such an adjudication.

Title Max's policy that no assistant manager work more than forty hours per week. In contrast, here, Plaintiffs have submitted five declarations of Opt-In Plaintiffs in addition to over 50 opt-in consent forms from potential plaintiffs.

Third, Peco points out that all current opt-in plaintiffs were employed by the same contractor and argues that failure to produce evidence of non-Armco catchers who wish to opt-in counsels in favor of a denial of conditional certification. In this Circuit, part of the conditional certification inquiry is whether "there are other employees of the [employer] who desire to 'opt-in.'" *Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1244 (11th Cir. 2003) (citation omitted). However, as Plaintiffs point out, in class action suits where there is a parent company with separate locations, there is no requirement for Plaintiffs to show that there are employees that desire to participate on a location by location basis.[16]

Peco also "vehemently denies plaintiffs' allegation that it was a 'joint employer'" with any of the independent contracting companies. (Doc. 75 at 13.) However, Peco acknowledges that "applicable precedent establishes the Court should wait and address the joint employer doctrine at the summary judgment or

---

[16] *See e.g. Williams v. Omainsky*, No. 15-0123-WS-N, 2016 WL 297718, at *6 (S.D. Ala. Jan. 21, 2016) (rejecting employers' argument that plaintiffs must establish desire to participate "on a facility-by-facility basis" holding that such a requirement would be not be compatible with the FLSA and would be in "conflict with numerous persuasive authorities not requiring evidence of similarly situated plaintiffs at each and every location in the proposed class").

decertification stage in not in evaluating a conditional certification motion." (*Id.* at 33 (citing *Reece v. United Home Care of N. Atlanta, Inc.*, No. 1:12–CV–2070–RWS, 2013 WL 895088, at *5 (N.D. Ga. Mar. 8, 2013)). The Court therefore will reserve an analysis of the joint employer defense for another stage later in the proceedings.

In sum, Plaintiffs have provided enough evidence to lead this Court to conclude that the putative plaintiffs are similarly situated for conditional certification. In *Grayson v. K Mart Corp.*, the court specifically stated that the requirement for a collective action is one of similarity—not of sameness—and is "less stringent" than for joinder of parties under Rule 20 or certification of a class action under Rule 23. 79 F.3d 1086, 1096 (11th Cir. 1996).

### B. Notice and Opt-In Consent Forms

Plaintiffs argue that the Court should allow them to issue notice to

> All individuals who worked as members of live-haul, chicken-catching crews that caught Peco Foods, Inc. chickens at any time between [three years prior to the date that the Court issues an Order granting Conditional Certification and the present], and who were paid via a third-party contractor that entered into an "Independent Contractor Service Agreement" with Peco Foods, Inc. that did not provide for the payment of wait time or overtime compensation by Peco Foods, Inc. (the "FLSA Collective").

(Doc 63 – 2.) They have submitted a proposed notice form and opt-in consent form. Plaintiffs have also requested (1) a 90-day opt-in period; (2) that notice be

provided by both mail and email and posted at each farm where potential claimants work; (3) that a duplicate copy of the Notice be sent as a reminder forty-five days after the initial mailing to those Live-haul, chicken-catching crews who have not yet opted in; (4) that the opt-in consent form will be deemed filed upon receipt by Plaintiffs' Counsel.

Peco argues that notice should only be sent via first-class mail—not by email and that a reminder notice is inappropriate because it would improperly encourage potential class members to join a lawsuit. They also object to the proposed notice on the following grounds: 1) it incorrectly states the applicable limitations period[17]; (2) fails to inform putative class members that they may be responsible for costs and expenses; (3) fails to provide that a potential plaintiff may select other counsel and directs potential class members to contact Plaintiffs' counsel if they have questions or concerns; (4) fails to direct that the forms should be sent to the Clerk of the Court, not Plaintiff's counsel; and (5) the opt-in period should be limited to sixty days. They also object to Plaintiffs' request that Peco be required to post

---

[17] Though the statute of limitations for claims under the FLSA is usually two years, see 29 U.S.C. § 255(a), an exception applies for willful violations. Where the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute," the statute of limitations is increased to three years. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Though Defendants aver that Plaintiffs "have presented no evidence of an alleged willful violation[,]" the Court finds record evidence submitted supports the plausibility of their claim that Peco knew of its obligations under the FLSA and deliberately used contract labor to avoid complying with it. As such, the statute of limitations is due to be extended to three years.

notice. In light of the disputes between the parties regarding the proposed notice, in the interest of judicial economy, parties are ORDERED to meet and confer regarding the content of the proposed notice; and shall submit a joint proposed notice form.

IV. CONCLUSION

Plaintiffs have established "a reasonable basis" for the allegation that a class of similarly situated persons exists. *Grayson*, 79 F.3d at 1097. Therefore Plaintiffs' Motion (doc. 69) is due to be granted.[18] The Court hereby conditionally certifies an opt-in class consisting of all current and former hourly employees of Peco whom Peco employed at any time between three years prior to the date of this Opinion. The parties will be directed to confer and jointly file with the Court a proposed collective action notice and plan for facilitating notice and the parties are to proceed through discovery accordingly. An Order consistent with this Memorandum of Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on March 27, 2018.

L. Scott Coogler
United States District Judge

190685

---

[18] Plaintiffs also filed a Motion to Supplement. (Doc. 81.) Because the Court has found Plaintiff's Motion for Conditional Certification sufficient and has not considered the disputed contents of the motion to supplement in its decision, that Motion (doc. 81) is due to be denied as moot.